Mr. Justice Thachek
delivered the following dissenting opinion.
The examination which I have been enabled to give to this case, has produced convictions in my mind different from those of the majority of the court.
|- The action was instituted upon the defendants’ promissory note, payable to the plaintiffs four months after its date. On the trial, it was contended for the defendants, that the bank had discounted the note and paid its amount, deducting at the rate of seven per cent, per annum, which was reserved for the interest ; that it was made a part of the contract that the defendants should deliver to the bank a certain number of bales of cotton, as additional security for the payment of the note, which were to be shipped abroad by the bank and there sold, the defendants paying “ every expense of whatever kind ; ” that the defendants were not to be credited with the net proceeds of the sales until the account of sales had been received by the bank, and that the p^ank should receive the profit to be made by the sale of domestic exchange between Grand Gulf and the northern cities, which was predicated upon the cotton. On the other hand, the profit derived from the sale of domestic exchange was claimed by the bank, not to have been a device upon its part to obtain more interest than its charter allowed, but as only *185 a fair and reasonable compensation for its labor and trouble in shipping and selling the cotton. The jury found for the defendants, which, as the pleadings presented those questions, was a finding that the bank did make the contract of discount knowingly, corruptly, and with intent to take and receive a greater rate of interest than seven per cent, per annum, and did, in fact, upon the contract, take and receive a greater rate of interest than seven per cent, per annum, and thereby violate a prohibition of its charter.
The inquiries whether the agreement to take and sell the cotton for the account of the defendants’ note, and the agreement to reserve by the bank the profit on the domestic exchange were used to cover the intention of taking more than seven per cent, interest, and did effect that object; or, whether that agreement was simply for the purpose of obtaining collateral security for the payment of the note, and the profit on the domestic exchange was contemplated and taken only in the light of compensation for the trouble of the receipt and sale of the cotton, have been held to be proper questions of fact for the decision of a jury. Commercial Bank of Manchester v. Nolan, 7 How. 521. This is in accordance with a previous opinion that the quo animo with which a contract was made must be established by a jury. Planters Bank v. Snodgrass, 4 How. 623. See also Bartlett v. Williams, 1 Pick. 288.
The Bank is prohibited by its charter to take more than seven percent, per annum upon any of its loans upon promissory, notes payable within twelve months from their date. The first inquiry is, did the evidence warrant the finding of the jury? There is ample evidence in the record that the bank did intend to obtain for the loan of her money a greater rate of interest or profit than seven per cent., and that, especially by means of the domestic exchange, she did effect that object. It is admitted that taking domestic exchange does not necessarily constitute usury : but it is equally clear that it is a question -for the jury, whether taking exchange in addition to interest, is intended as a case for a usurious contract. Andrews v. Pond et als. 13 Peters, 65.
*186 The issue presented to the jury, and the facts.bearing upon that issue aré these: The issue charged the plaintiffs with having made the contract of loan corruptly with intent to obtain a greater profit than at the rate of seven per cent, in violation of her charter. The proof is that at the time of the contract, the bank deducted her discount at the rate of seven per cent., being the full amount allowed by her charter, and made an additional stipulation in the contract, by which she was to have the benefit of the domestic exchange in New York or Philadelphia, together with the use of the money from the time the bills were sold at the north, until advices were received at Grand Gulf. Was not this exchange a probable profit to the bank at the time of the contract, and did not this probable profit constitute part of the consideration of the loan ? The answer of the bank admits that exchange was worth at the time of the contract from three to five per cent, premium in specie, and from fifteen to twenty per cent, in the notes of the bank. It is also stated in the bill of exceptions, that “ the defendants proved by several witnesses that at the time the above note was discounted, and at the time the arrangement and agreement were made, the rate of exchange between Grand Gulf and the northern cities was about from three to five per cent, against Grand Gulf in specie, and about from fifteen to thirty in Mississippi currency.” There was certainly then a probable profit in addition to the amount at the rate of seven per cent, already taken. It was then an agreement to obtain in payment of the loan, in addition to the discount, from three to five per cent, more than the amount of the loan in specie, and from fifteen to twenty per cent, more in Mississippi currency.
There is also, to my mind, ample evidence that the bank did actually make a profit out of the exchange. The answer of the bank states that “the funds arising from the shipments of cotton amounted to $624,720 41. The bank used in the payment of debts about $272,664 03, and drew for $16,790 48, at three per cent., and for $335,275 90, at the rate of five per cent, premium of exchange.” Again, the answer says, “ the bank, when settlements have been made, has always retained the domestic *187 exchange, believing she had a right to do so.” This is an admission that the domestic exchange did amount to a profit in all cases, for how could the bank always retain it, if there were none to retain? Furthermore, Dr. Parirer proves that the bank sold about $350,000 of this exchange, at three and five per cent, premium. Thus, there is positive proof, besides the admission of the bank, that at the time the bank drew, the value of the domestic exchange was at least five per cent., and that the bank did make between $15,000 and $20,000 profit on the domestic exchange, besides using in payment of her own debts at the north a large amount, upon which it is reasonable to presume the same rate of profit might have been made, and which was therefore saved to the bank.
But was this profit upon the domestic exchange merely compensation for the trouble of the bank in acting as the agent of the planter for the sale of his cotton? Admitting that a reasonable compensation might have been retained for agency, although I am inclined to doubt this as to a bank, because I am at a loss to see where a banking corporation obtains the power to act as factor, and receive commissions as a mercantile agent; still, it was certainly a very proper question for the jury to decide, whether the compensation bargained for was a reasonable one, or whether it was a cover for usury and a violation of the charter. It is important to notice here, that by the agreement the cotton was to be shipped at the risk of the owner, and he was to pay “ every expense of whatever kind,” and “all charges and expenses of whatever kind.” These provisions include every kind of legitimate charge and expense, in which would properly fall charges for extra clerk hire, &c. The domestic exchange was therefore not received by the bank to meet any charge, or expense, or risk whatever; for all these were otherwise provided for in the contract.
For what then was the domestic exchange reserved by the bank ? The bank says, as compensation for her trouble; the jury says it was reserved as an additional profit on the loan, beyond the rate authorized by the charter. The bank’s answer to the bill of discovery, states that the reservation of the do *188 mestic exchange was not intended as a device or cover for usury, but was a bona fide transaction. Are the defendants estopped from denying any part of the answer 1 In the first place, the mere assertion of a respondent in a bill of discovery, as to his intention, cannot overrule the facts admitted by him, or otherwise legally proved. The answer admits the agreement to reserve the domestic exchange was a part of the contract. It further admits that between $15,000 and $20,000 profit was actually received by virtue of these agreements. It then goes on to state, that this profit was agreed on, not as a cover for usury, or a violation of the charter, but as a bona fide compensation for trouble, &c. The jury were certainly entitled, and it was their duty, to look at the facts admitted in the answer, and draw their conclusions from those facts, as well as from the mere assertion of intention, not made in respect to any question. The answer of the bank to the bill of discovery was made by John Lindsay, president, &c. In his answer to the seventh interrogatory, he states, that at the time this contract was made, James P. Parker was president of the bank. It does not appear, therefore, that Mr. Lindsay knew anything about the contract at the time it was made. He knew nothing except from the books of the bank. His answer respecting the intention of the contract is merely his opinion, and does not amount to a legal fact. Besides, as will be seen hereafter, it is very immaterial what the bank intended in a case of this kind.
Against this expression of opinion in regard to intention, how do the facts stand 1 The principal contract was entirely a contract of loan. The terms upon which the bank would loan, are distinctly stated in the “ extract from the board of directors of the bank,” and from the receipt given for the cotton.
By these written documents, it appears that the bank agreed to loan or advance money on several conditions or considerations. 1st. The borrower was to give his note, with the usual personal security. 2d. He was to place in the possession of the bank, as collateral security, cotton, at the rate of one bale for every fifty dollars loaned, — the cotton to be sold on account of the borrower, at his risk, he paying all expenses and charges of *189 whatever kind. 3d. The bank was to retain the domestic exchange, which is proved to have been worth five per cent, premium, at least, at the time of the contract, and also at the time the bank drew on the proceeds of the cotton. 4th. It was further agreed that, although the payment was to be made to the bank at the north, it was not to be credited upon the note until advice was received here of its payment there, and thereby giving the bank the advantage of ten or twelve days. All these are written conditions of the loan, and form part of the contract of loan, but nothing is said, in any part of the contract, that the bank should reserve the domestic exchange, and have the temporary use of the money after actual payment, for her trouble as agent. If such were the intention, why was it not mentioned in the resolution of the board authorizing the contract, or in the cotton receipt, given when the contract was completed 1 The loan in this case was for four months, and the discount taken was therefore two and one-third per cent. The profit on the exchange was five per cent. The principal contract was that of loan, which was the legitimate business of the bank, whereas acting as agent or factor for cotton planters, was not its legitimate business. It took the cotton as collateral security, and was properly acting for itself as much as for the cotton owner.
But the bank says the five per cent, exchange was merely compensation for trouble, &c. It is not pretended that there was any contract that the exchange should be taken as compensation for agency in selling the cotton. All expenses and charges whatever were otherwise provided for in the contract. A fit compensation for trouble could properly come only under this clause of the contract, and to it only could it be charged. The bank, however, says that it intended to take the profit on the domestic exchange on the score of compensation for its trouble, and not as a consideration of the loan. How can the court or jury ascertain the intention of the contract, except from its terms, and the facts connected with it. It was a written contract, and bespoke its own intention.
From the written terms of the contract, and the facts attending it, the jury have drawn the conclusion that the five percent. *190 exchange formed a part of the consideration of the loan, and that without it, the loan would not have been made. The evidence of Mr. Callender, cashier of the bank, proves that “ the bank was not loaning money in any other way, at the time she was making advances in cotton.” This conclusidft of the jury was not so against the weight of evidence, as that this court should set aside the verdict.
But, even admitting, what was not the case, that the bank had expressly stipulated that the exchange should be reserved as compensation for the bank’s agency in selling the cotton, still the jury might well have come to the same conclusion, on the ground that the stipulation was a shift and device to cover usury. The following is then the true statement of the contract. The bank proposes to the defendant thus: “We will loan you $10,000, for four months, at two and one-third per cent., provided you will give your note, -with approved personal security, and will also place in our hands two hundred bales of cotton, to be sold on your account, at your risk, you paying all charges and expenses whatever, and allowing us, in addition, for our trouble, the domestic exchange upon the proceeds of said cotton, which is worth five per cent., and the use of the amount of the account of sales, for ten days.” A jury might well say, that five per cent, brokerage on a loan, upon which the whole interest is only two and one-third per cent, is unreasonable, and bears intrinsic evidence of being a device to obtain more than two and one-third per cent, for a four months’ loan of money. After the payment of all expenses and charges, five per cent, might reasonably be deemed a heavy extra factorage. In short, from reading the evidence, I am irresistibly brought to the conclusion, that the main object and consideration in all these loans on cotton were to obtain the benefit of this exchange, and that, had exchange been at par, the loans would never have been made.
It has been before intimated that, as to the intention of the bank, it is wholly immaterial whether the bank intended to violate its charter, or the law of usury. The only question is, did the bank intend to make the contract it did make, and was *191 that contract in violation of its charter ? It is of no consequence •whatever, whether the bank knew it was making an illegal contract, or not. This point, as to intention, however, is so elaborately and conclusively argued by Chief Justice Sharkey, in the case of The Planters Bank v. Snodgrass, 4 How. 623, that I refer confidently to that opinion, as covering the whole ground assumed in relation to this matter.
Upon the subject of the finding of the jury, it should be, noted that, by the contract, the payment, to the extent of the proceeds of the cotton, was made at the north; yet, by the express agreement of thé parties, the note here was not to be credited but from the timé of advice received here of such payment. The benefit of the use of the money, during that interval, is not pretended to be derived on the score of compensation for trouble, and is a clear, palpable, and undoubted evidence of a taking of interest greater than at the rate of seven per cent, per annum.
The principal amount of the note, in tiiis case, stood at no risk. The discount was taken at the time of the loan. The principal is secured by note, with sureties, approved by the bank; it is payable, at all events, and in constitutional currency.
■If the.con tract in this case were usurious, what is the consequence of that usury ? It is laid down that a bank is governed by the existing laws of a general nature, in force at the time of its creation, excepting so far as such laws are modified by its charter. It is thereupon contended that, if a bank exceed the rate of interest fixed by its charter, the contract is not consequently wholly void, but the bank forfeits all interest. The latter position rests upon the ground that the interest laws of this state constitute a general law of usury. But this position fails, if it can be shown that there was not in existence in this state, at the time of the grant of this charter, or at the' time of the making of this contract, any general law of interest or usury which can affect this contract.
The only laws upon the subject of interest will be found in How. & Hutch. 374, 375, sects. 14, 15, 16, and it will be seen *192 that they have no reference to contracts in general, but are specifically limited in their operation.
The first (sec. 14) enacts that no person shall take directly, or indirectly, “ for any contract, bond or note for the payment of money, founded on any bargain, sale or loan of wares and merchandise, goods' and chattels, lands and tenements, or any use or occupation thereof,” interest at the rate of more than eight* per centum per annum, and that if it shall appear that more than that rate shall have been taken “upon any such contract, bond or note,” the principal only shall be recovered.
This section has no relation to contracts founded°upon a bare loan of money. The contracts designed to be controlled by this statute, must be “founded on some bargain, sale or loan of wares and merchandise, goods and chattels, lands and tenements, or some use or occupation thereof.” The word “ bargain,” in this sentence, grammatically considered, I conceive, has exclusive relation to “ wares and merchandise,” &c., and not to money. The meaning of the word, in its common acceptation, is “ an agreement between persons concerning the loan, exchange or sale of property.” The old law of this state provided a rate of interest “ for the loan of any 1 money,1 wares, merchandise, or other commodity whatsoever,” which the law, at the time of this contract, did not embrace. Act, March 1st, 1805; Toulrnin’s Dig. 404; Turner’s Dig. 312. The enactment of these sections, however, June 25th, 1822, repealed all previous laws upon the subject. Rev. Code, 8, sec. 8. Thus the first section of the act of March 5, 1805, entitled “an act against usury,” regulated the rate of interest to be allowed on contracts “/or the loan of any money11 as well as upon contracts for the loan of any wares, merchandise, and other commodity. By the constitution of 1817, A. 6, s. 10, the legislature was forbidden to pass any law, prior to the year 1821, controlling the rate of interest, when fairly agreed upon in writing between contracting parties, for a bona fide loan of money. The courts of the day held that rates of interest thus agreed upon were excepted out of the act of 1805, by this provision of the constitution of 1817. Walker’s R. 207. But in the *193 act of June 25, 1822, entitled “ an act regulating the rate of interest,” which was enacted under the constitution of 1817, and which was the act in force at the period of the contract in this case, the legislature omitted to regulate the rate of interest upon contracts “ for the loan of any money,” excepting in instances of conventional interest upon the face of the note, in writing. As the legislature had before it the act of 1805, at the time of the enactment of the act of 1822, it is fair to presume that the omission to provide a rate of interest for general contracts for the loan of money, was by express design.
The fifteenth section enacts that the rate of ten per centum per annum interest, “ may be taken, allowed, and recovered, on all contracts, bonds or notes, in writing, signed by the debtor, for the bona fide loan of money, expressing therein the rate of interest fairly agreed upon between the parties, for the use of the money so loaned,” but that if it shall appear that more than that rate shall have been taken “ by any such contract, bond or note,” only the principal sum shall be recovered.
This section relates exclusively to contracts for the bona fide loan of money, and where the rate of ten dollars on one hundred dollars for a year, and at that rate for a greater or less sum, and for a longer or shorter period, is expressed upon the face of the contract.
The sixteenth section enacts, that the rate of eight per cent, interest shall be allowed “on all contracts, bonds and notes in writing, signed by the debtor, orders, bills of exchange, and accounts stated which ascertain the sum due, after the same is due and payable; and on all judgments and decrees, founded on contracts, debts or demands bearing interest, the raje of interest shall be the Same as that allowed by law on the contract, debt or demand, on which such judgment or decree shall be founded; and on judgments and decrees in all other cases, the rate of interest shall be eight per centum per annum.”
If this section has not exclusive relation to contracts matured, bonds and notes past due, and judgments and decrees, &c. then it must constitute the general law upon the subject of interest, of which the fourteenth and fifteenth sections form the excep- *194 lions. Now no penalty being annexed to a breach of the sixteenth section, any such breach must fall under the common law penalty of usury, which is a forfeiture of both principal and interest. The fourteenth section applies alone to property contracts, and the fifteenth section to contracts for the bona fide loan of money, when the interest is agreed upon by the parties, and expressed in writing; and it is only to “ such contracts, bonds or notes,” that the penalty of the loss of the interest merely, can apply; for, certainly, the use of the term “ such contracts, bonds, or notes,” restricts that penalty to them alone. This construction of the law does not create a double rule in the same case; it simply marks the exceptions contained in the fourteenth and fifteenth sections. The sixteenth section contains expressions larger and more extensive in their import, than the others; it relates to “ all contracts, bonds and notes,” &c.; and this circumstance, according to the rule of the construction of statutes, would give this section generality. It is always the duty of the courts to give effect to the larger expression. Per Lord Tenterden, 7 B. & G. 643. How then can the penalty annexed particularly and exclusively to a violation of the fourteenth and fifteenth sections be applied to the sixteenth section, in the face of the well received rules for the interpretation of statutes? These rules, if regarded, must confirm the foregoing view of our interest laws. For “ when a general intention is expressed, and the act also expresses a particular intention, incompatible with the general intention, the particular intention is to be considered in the nature of an exception.” 5 Bing. 180 ; Dwar. on Stat. 658. Again, “ if in the same act of parliament, there be/me clause which applies to a particular case, and another which is conceived in general terms, the former shall not restrain the signification of the latter.” 2 T. R. 164. It seems to follow, therefore, that if there was any general penalty for usury in this state, which could govern this contract, it was one which demanded the forfeiture of both principal and interest.
It may here properly be added, that the lowest rate of interest allowed generally, in this state, was eight per cent, per an-num, while the rate of interest to which the bank was restricted *195 by its charter, on contracts of the kind under consideration, was seven per cent, per annum. It is difficult for me to understand, even admitting the rule contended for, how a penalty, applying to contracts where eight per cent, interest was allowed, can be applied to contracts restricted to seven per cent, interest. In this case, for instance, although, in my view, it is manifest that the bank did take more interest than at the rate of seven per cent, the exact excess does not appear, and, consequently, as it might not have reached eight per cent, the general law might not, in point of fact, have been violated. It seems to me an anomalous decision, to say that, although the special law of a charter restricts its loans to seven per cent, per annum, the general law of the land will permit those loans to be made at seven and ninety-nine one-Hundredths per cent, per annum. Had the charter of the bank simply authorized loans of money, or had its rates of interest been the same as the general laws of interest, and had there been a general penalty in the state for usury, it then might, perhaps, have been contended with some show of reason, that the general penalty should govern the bank.
But the charter of this bank, (Acts 1833, c. 17, s. 13,) declares “ that the company shall not take more than seven per centum per annum upon any of its loans upon promissory notes, payable within twelve months from the date of such loans.” Here is an express prohibition, and with no penalty annexed. The question now arises : Had the bank a right to make the contract she did? Assuming the view I have taken of the facts to be correct, and comparing them with the above prohibition, and clearly the bank had no right to make such a contract. This must determine the case against the bank. Bank United States v. Osborn, 9 Wheat. 824. In the case of the Bank United States v. Owens et als. 2 Pet. 539, the same principle was decided, and in the words of the court, it is laid down that “ there can be no legal rights where there can be no legal remedy, and there can be no legal remedy for that which is itself illegal.” In the case of the Bank United States v. Owens et als. the point was directly made as to what was the effect of a bank’s taking interest forbidden by its charter, although the *196 charter does not declare such contracts void, and it was decided that “ such contracts are void in law, upon general principles.” And upon a rigid examination of the case of the Bank United States v. Waggoner et al. 9 Pet. 378, where the case of Owens et als. was further considered, I agree with the chief justice of this court, in his opinion in the case of the Planters Bank v. Snodgrass, 4 How. 646, that “ so far at least as this question is concerned, the same decision was adhered to.”
The position is not assumed by me, in this case, nor do I understand it to be taken in any of the cases just referred to, that the defence is put upon the ground that the contract was an act of misuser by the corporation, or a violation of its charter, and, therefore, void, because the charter was thus annulled. I am not, indeed, prepared to say that the act of taking usury, by a corporation, is a valid cause of forfeiture of its charter. For if, at the time of the act, a general law of usury prevailed, to which all contracts were liable, such act might be subject to the penalty only of that general law, or if no general law existed by statute, or a corporation was not subject to it, then it might be liable only to the common law penalty for usury. But the points raised by the circumstances of the case, are, in this view of it, merely, was the contract legal, and such as the corporation had power to make 7 If not, then the contract was void upon those general principles of law, which apply equally to corporations and individuals.